******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NIRONE HUTTON
(AC 41011)

Alvord, Prescott and Norcott, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. He claimed that his constitutional right to confrontation was violated when the trial court admitted into evidence, as a prior inconsistent statement pursuant to *State* v. *Whelan* (200 Conn. 743), a videotaped statement to the police that was made by W, in which W identified the defendant as the shooter. The defendant and W had gone to a housing complex where they became embroiled in a confrontation with the victim, who had been selling fake crack cocaine there, which adversely affected the defendant's drug business. The defendant claimed that he shot the victim not over a dispute about gang turf and drugs, but in defense of his friend, S, who was being kicked and pistol-whipped by the victim during the confrontation. After W took the witness stand and was sworn in to testify before the jury, he refused to provide verbal responses to any of the questions asked by the prosecutor and by defense counsel, and refused to answer questions after the trial court ordered him to do so. In its ruling admitting the videotaped statement, the court described W's nonverbal mannerisms that it observed when he was on the witness stand, and determined that his presence on the witness stand and the jury's ability to assess his demeanor and body language in responding to questions was sufficient for cross-examination purposes and for confrontation. *Held* that the trial court violated the defendant's right to confrontation when it admitted into evidence W's videotaped statement to the police, as W's refusal to provide verbal responses to counsels' questions rendered him functionally unavailable to testify, which thwarted the defendant from any meaningful opportunity to cross-examine W and to expose infirmities in the videotaped statement or the reasons behind W's recalcitrance or lack of memory: although W was called to the witness stand and put under oath before the jury, his outright refusal to respond to any questions rendered him unavailable for cross-examination, the court did not make any finding that W intended any of his gestures or body language to convey a specific nonverbal response to a question that would amount to a yes or no, and the meaning of the court's observations of W, which were unconnected to verbal responses to questions, was ambiguous and too speculative to be considered the equivalent of testimony, as body language and demeanor are instructive only in assessing the credibility of testimony actually given and are not a substitute for verbal or nonverbal responses that are intended to convey a substantive response to a question; accordingly, because the defendant was deprived of an opportunity to cross-examine W regarding his prior videotaped statement to the police, the statement was inadmissible, and its improper admission was not harmless beyond a reasonable doubt, it having been reasonably likely that the statement played a significant role in the jury's decision to disregard the defendant's justification defense, as the defendant's claim that the shooting occurred in his defense of S, even if technically weak, was sufficiently supported in law and fact such that the court instructed the jury on that defense, and W's statement provided the jury with evidence of a clear and alternative motive on the part of the defendant to shoot the victim that, if credited, obliterated any need for the jury to consider the defendant's justification defense.

Argued October 25, 2018—officially released March 19, 2019

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Kahn, J.*; verdict and judgment of guilty, from

which the defendant appealed. *Reversed; new trial.*

*Jennifer B. Smith*, assigned counsel, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Nirone Hutton, appeals from the judgment of conviction, rendered against him after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant claims on appeal that the trial court violated his rights under the confrontation clause of the sixth amendment to the United States constitution[1] as articulated in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Specifically, the defendant argues that the court violated his confrontation rights by improperly admitting into evidence a witness' prior videotaped statement to the police in accordance with *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), because the witness was functionally unavailable for cross-examination due to his refusal to provide verbal responses to any questions asked by the prosecutor or defense counsel when called to testify before the jury. The defendant further argues that the improper admission of the witness' prior statement did not constitute harmless error because its content significantly undermined his justification defense. We agree with the defendant and, accordingly, reverse the judgment of conviction and remand the matter for a new trial.[2]

The jury reasonably could have found the following facts. Late in the evening on February 27, 2007, the defendant and Lenworth Williams entered Building 5 of the Greene Homes housing complex in Bridgeport, at which time they encountered the victim, Juan Marcano, and several of his friends. The victim and his friends became embroiled in a confrontation with the defendant and Williams. The defendant, who was part of a group that controlled the sale of drugs in Building 5, was angry with the victim because he had been selling fake crack cocaine in Building 5, damaging the defendant's reputation and drug business. As the confrontation escalated, the victim went to his car and retrieved a handgun. At some point, Williams was able to get away by ascending a nearby staircase, returning soon thereafter with Garrett Bostick, also known as "Slim," who lived on the fifth floor of Building 5, and John Trevil, also known as "Pealz" or "Pills." When the defendant and his group tried to exit the lobby back into the stairwell and up the stairs, the victim grabbed Slim and pulled him back down the stairs, at which time the victim was kicking and pistol-whipping Slim. The victim, who was six feet, eight inches tall and weighed approximately 400 pounds, was considerably larger than Slim. Neither the defendant nor his friends called for help or otherwise attempted to break up the fight by nondeadly means. Rather, the defendant pulled out a pistol and fired two gunshots into the victim's back, which immediately incapacitated him.

The victim's friends chased the defendant and his

group up the stairs. Slim and Pills went into Slim's apartment. The defendant tossed his gun into the apartment before he and Williams continued down the hallway, exiting the building via a different stairway. Williams eventually drove the defendant back to his mother's house at 135 Higgins Avenue.

The victim was able to call 911 for medical assistance and, after the police responded, he was transported to Bridgeport Hospital. The next morning, the police arrested Slim, Pills, and a third man, Ricardo Richmond, at Building 5 on wholly unrelated drug charges. At that time, the police searched Slim's apartment and recovered a gun that later was determined to be the gun used in the shooting of the victim.

The police showed photographs of Slim, Pills and Richmond to the victim, who remained hospitalized. The victim was able to identify Slim as the person with whom he was fighting at the time he was shot. The victim could not, however, identify the shooter from the photographs and maintained that the only other persons in the area at the time of the incident were himself, Slim, and Slim's friends. The victim eventually died of complications from his gunshot wounds.

Despite some leads, the police were unable to develop sufficient evidence to obtain an arrest warrant, and the matter eventually was classified as a cold case. On July 4, 2013, however, Williams, who the police had arrested and were booking on unrelated charges, informed the police that he had information about the 2007 shooting. He thereafter gave a videotaped statement to the police in which he identified the defendant as the person who shot the victim. In his statement, Williams also explained that Building 5 was part of the drug dealing territory controlled by the defendant and Slim. According to Williams, the defendant confronted and shot the victim because the victim had been selling fake drugs in Building 5, which adversely affected the defendant's drug business.[3]

Williams' statement identifying the defendant as the shooter also corroborated other evidence that the police had collected implicating the defendant in the victim's murder. Specifically, the police had obtained a letter that the defendant had sent to a friend in prison. In the letter, the defendant admitted to having committed a "redrum," which was street slang for murder, and he also indicated that Slim had been caught with the gun he used a few hours later. Additionally, a jailhouse informant, Anestos Moffat, who was incarcerated for a time with the defendant and Pills, told the police that the defendant had confessed to him about shooting a "Spanish kid" who was "getting the best of Slim . . . ."

On October 4, 2013, the defendant was arrested and charged with the victim's murder.[4] He pleaded not guilty and elected a jury trial. The defendant testified at trial

on his own behalf and admitted to shooting the victim. The theory of the defense was that the defendant had shot the victim, not over a dispute about gang turf and drugs, but in defense of his friend, Slim, who was being repeatedly pistol-whipped by the victim.[5] The state's theory was that the confrontation with the victim centered on a dispute over the victim selling "burn bags," i.e., fake drugs, in the defendant's territory and that the evidence established beyond a reasonable doubt that the defendant's actions were not justified as a defense of others.[6]

The jury found the defendant guilty of murder. On May 2, 2016, the court sentenced him to fifty-five years of incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

The defendant claims on appeal that the trial court improperly violated his constitutional right to confrontation by admitting into evidence Williams' videotaped statement to the police. In particular, the defendant argues that because Williams refused to answer even a single question when he was called to testify before the jury, he was functionally unavailable for purposes of cross-examination and, therefore, his statement was inadmissible under *State* v. *Whelan*, supra, 200 Conn. 753, and its admission violated his confrontation rights under *Crawford* v. *Washington*, supra, 541 U.S. 36. The defendant further argues that the state could not demonstrate that the improper admission of the statement was harmless beyond a reasonable doubt.

The state responds that the court properly admitted Williams' statement as a prior inconsistent statement in accordance with *Whelan*, and that Williams' refusal to give verbal responses to the questions asked at trial did not implicate the defendant's confrontation clause rights because the jury was able to observe and evaluate Williams' nonverbal reactions to the questions posed to him by the prosecutor and by defense counsel. We agree with the defendant that, despite Williams' physical presence on the witness stand, the defendant was not afforded a meaningful opportunity to cross-examine Williams about his prior statement due to Williams' outright refusal to answer questions, and, therefore, the admission of Williams' statement violated the defendant's right to confrontation. We also agree that the state has failed to demonstrate that the error was harmless beyond a reasonable doubt.

The following additional facts are relevant to our resolution of this claim. On the afternoon of February 3, 2016, during the state's case-in-chief and outside the presence of the jury, the state informed the court, *Kahn, J.*, that it intended to call Williams as its next witness. The prosecutor informed the court that Williams likely would be a "difficult witness" and that the court may want to permit the state first to question him outside the presence of the jury "just to see where he stands

. . . ." The court asked the prosecutor if Williams had a "fifth amendment issue . . . ." The prosecutor indicated that because the case was nine years old, everything but the murder fell outside the statute of limitations and, thus, he did not believe that Williams intended to invoke the fifth amendment. Nevertheless, the prosecutor informed the court that the witness was represented by Attorney Don Cretella, who was present and could address that issue further. Cretella told the court that he had spoken with Williams in the courthouse lockup and that he did not anticipate him invoking his fifth amendment right not to incriminate himself. Cretella, however, informed the court that Williams had indicated that he was going to refuse to answer any questions, despite Cretella's advisement of the possible consequences of pursuing that course of action. After taking a brief recess to speak with all counsel in chambers, the court came back on the record and indicated that it intended to permit the state to question Williams outside the presence of the jury.

After Williams was sworn in, the court addressed him. The court first indicated its understanding that Williams did not intend to invoke his fifth amendment right not to testify. Williams answered that this was correct. The court then explained to Williams that, as a subpoenaed witness, he would be questioned under oath by the state following which defense counsel would have an opportunity to cross-examine him. Williams indicated that he understood the process. When the court asked if he intended to go forward with that process, Williams said: "I'm not complying with nothing you're asking me, ma'am." The court responded: "Well, I don't know what you mean by not complying, but the state is going to ask you some questions . . . ."

The prosecutor began by asking Williams his name, which did not elicit a verbal response. The following colloquy ensued:

"The Court: Mr. Williams, are you going to answer the questions?

"[Williams]: No. There's no question. I don't know nothing.

"The Court: Well, that's different. If you don't know anything, that's different. The question is whether you're going to answer any of the questions—

"[Williams]: No.

"The Court: —posed to you—

"[Williams]: No.

"The Court: —by the state.

"[Williams]: No.

"The Court: What about questions posed by [defense counsel]?

"[Williams]: No—um, no, um, no.

"The Court: You understand that if you refuse to answer questions the court can hold you in contempt?

"[Williams]: Yeah, do that then.

"The Court: And I can sentence you to six months in jail.

"[Williams]: Okay.

"The Court: That you will not get any credit for any good time, and it will not count toward any of your sentence. So that you're basically doing dead time for six months with no credit whatsoever.

"[Williams]: Everything is understood.

"The Court: I'm sorry?

"[Williams]: I said I understand. I understand everything clearly.

"The Court: Okay.

"[Cretella]: I have advised him of that, Your Honor.

"The Court: You have advised him—

"[Cretella]: That it's my opinion that he does—

"The Court: —that the court could hold him in contempt?

"[Cretella]: And it is my opinion that he does understand what I've explained.

"The Court: The state's position?

"[The Prosecutor]: Your Honor, the state would ask that the witness be held in contempt if he refuses to answer the questions.

"The Court: Do you understand, Mr. Williams, that if—if you believe that the information you gave previously is wrong, this would be your chance to correct that, you understand that, and to answer the questions posed to you by the defense. But it's your position not to answer any questions posed by either side?

"[Williams]: No. As I told you before, I'm not answering no questions. I don't know nothing.

"[The Prosecutor]: You can say that to each one of my questions.

"The Court: Yes.

"[The Prosecutor]: You can say that. If you don't know anything, you don't know anything to any of my questions. Did you meet with Detective [Heitor] Teixeira?

"[Williams]: (No verbal response.)

"[The Prosecutor]: Did you meet with the Bridgeport Police Department detectives on July 4th, 2013?

"[Williams]: (No verbal response.)

"[The Prosecutor]: Do you remember meeting with them?

"[Cretella]: Your Honor, the offer of proof I think we can safely assume this is how each question will be answered.

"The Court: So, Mr. Williams, I'm going to begin contempt proceedings. You can talk to your lawyer."

After making findings that the defendant had appeared pursuant to a valid subpoena, he did not have a valid fifth amendment claim, and he was refusing to answer any questions "not just with I don't know anything but not even answering," the court gave the parties an opportunity to address the court regarding contempt. Both Williams and Cretella declined to make any statement. The prosecutor also made no statement with respect to the contempt proceedings but argued that because Williams had indicated to the court under oath during the state's proffer that he did not know anything about the shooting, which was in direct contradiction to his videotaped statement to the police, the state should be permitted to play the videotaped statement to the jury as a prior inconsistent statement. Defense counsel argued that Williams was not "available" to testify and, therefore, his prior statement was not admissible under *Whelan*.

The court found Williams in criminal contempt and imposed a sentence of six months of incarceration for his failure to answer questions. The court ordered Williams to return to court the next day, however, and, indicated that, if Williams decided to answer questions at that time, the court would consider vacating the contempt conviction. The court reserved making a decision on whether Williams' videotaped prior statement would be admitted into evidence.

The next day, in the presence of the jury, the state again called Williams to testify. The prosecutor asked Williams if he remembered being in court the day before and telling the judge that he knew "nothing about nothing . . . ." Williams provided no verbal response. The prosecutor then asked Williams if he remembered being interviewed by the police on July 4, 2013, and signing a statement identifying the person who shot the victim in the present case. Williams refused to respond and initially would not look at the copy of his written statement when it was handed to him by the prosecutor to verify his signature on the document. At the state's request, the court admonished Williams that he was in court under a subpoena and had a legal obligation to answer the questions posed to him. The state briefly resumed questioning Williams, who continued to give no verbal responses to the prosecutor's questions. The court then excused the jury.

Once the jury left, the prosecutor renewed his request that the court allow the jury to hear Williams' videotaped statement. The prosecutor argued that the statement was admissible under *Whelan* as a prior inconsistent statement on the basis of Williams' testimony to the court the day before that he knew nothing. Defense counsel responded that the availability of a witness is a prerequisite to the admission of any *Whelan* statement and that Williams' refusal to answer any of the questions posed to him rendered him unavailable. Defense counsel clarified that he was not challenging whether the videotaped statement was inconsistent with the position Williams had staked out the day before, but that the admission of the prior statement without any opportunity for meaningful cross-examination would seriously impede the defendant's right to confrontation.

The court made an oral ruling admitting Williams' statement to the police, concluding that the statement met the *Whelan* criteria. Specifically, the court found that the statement was reliably recorded by audio/videotape, the statement was duly authenticated, and Williams had personal knowledge of the events recounted in the statement. With respect to the defense's objection that the witness was functionally unavailable and never subject to cross-examination with respect to his statement, the court first read into the record Williams' testimony proffered the day before, concluding: "Clearly, his statements yesterday under oath are inconsistent with the interview he provided to the police back on July 4th, 2013, as well as what he signed on that date. And pursuant to *State* v. *Simpson*, [286 Conn. 634, 945 A.2d 449 (2008)], the [Supreme] Court admitted under *Whelan* a taped interview, even though the witness did not remember making the prior statement. Also *State* [v. *Cameron M.*, 307 Conn. 504, 55 A.3d 272 (2012), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013), and overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 748 n.14, 754, 91 A.3d 862 (2014)]. That case really stands for the proposition that *State* v. *Pierre*, [277 Conn. 42, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006)] and other cases this court is relying on are still valid law.

"*State* [v. *Eaton*, 59 Conn. App. 252, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000)]. Also, there is no need for the court to find that the lack of memory is not feigned. And that's under *State* [v. *Cameron M.*, supra, 307 Conn. 504] and *State* [v. *Rodriguez*, 139 Conn. App. 594, 56 A.3d 980 (2012), cert. denied, 308 Conn. 902, 60 A.3d 286 (2013)]. And specifically in [*Rodriguez*], the issue was raised about a witness' lack of response to any questions . . . . And in a footnote the [Appellate Court] wrote: we note that the witness, in that case, need not have affirmatively renounced his statement for the court to have properly

decided it was inconsistent. [*State* v. *Rodriguez*, supra, 605 n.12.] The court makes its determination based on the overall effect of the witness' testimony looking at both omissions and contradictions under *State* v. [*Whelan*, supra, 200 Conn. 743].

"Both under [*Cameron M.*], [*Rodriguez*], as well as [*Pierre*], *State* [v. *George J.*, 280 Conn. 551, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007)], and under *Crawford* and other cases cited under *Crawford*, it is obvious that as far as availability, both under *Crawford* and under *Whelan*, as long as the witness is physically present on the stand, as he is, and the jury is able to assess his demeanor, his body language, his gestures, his omissions in responding to questions, that is sufficient for cross-examination purposes and for confrontation. And in *State* [v. *Pierre*, supra, 277 Conn. 57], [our Supreme Court] noted: The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony or to deny [that] the earlier statement was made at all. If, from all [that] the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. . . . Quite simply, when the declarant is in court, under oath, and subject to cross-examination before the [fact finder] concerning both his out-of-court and in-court statements, the usual dangers of hearsay are largely nonexistent. [Internal quotation marks omitted.]

"The court [in *Pierre*] goes on to note that: Additionally, we note that other jurisdictions that have had the opportunity to interpret what it means to [appear] for cross-examination under *Crawford* [v. *Washington*, supra, 541 U.S. 60 n.9], have concluded that a refusal or inability by the witness to recall the events recorded in a prior statement does not render the witness unavailable for purposes of cross-examination. And they cite cases for which I will now not cite. So, here's what I'm going to do. I'm going to allow the statements to come in."

The court then addressed Williams, explaining that the court was going to bring the jury back into the courtroom and that the state would resume asking him questions. The court explained: "You can choose to answer them or proceed the way you have, at which point they will read portions of yesterday's transcript, and the state will move to admit [your prior written and videotaped statements], at which point, based on my ruling, I will allow that to come in. It's your choice whether you choose to answer the state's questions,

not answer the state's questions, recant your statement, not recant it; take it back, not take it back, answer the defense's questions or not.

"I want you to understand something. Not answering the defendant's questions, you're not helping him any because the case law is clear, just by sitting there that's enough for cross-examination for the jury to assess whether you're truthful—your statement back then was truthful or not. They can assess your demeanor and your conduct."

After the jury returned, the prosecutor asked Williams a series of questions, none of which elicited any verbal response. Williams' prior videotaped statement was admitted into evidence and played for the jury. Williams refused to respond to any of the prosecutor's remaining questions, and he also refused to give verbal responses when defense counsel sought to cross-examine him. After both the prosecutor and defense counsel indicated they had no more questions for Williams, the court excused the jury.

Outside the presence of the jury, the court then elected to vacate Williams' contempt conviction rendered the day before despite the fact that Williams had continued to engage in the same contumacious behavior that had justified the court holding him in contempt the previous day.[7] The court next decided to place on the record the following observations it had made of Williams and the jury while Williams was on the stand: "[T]he jury was looking at the witness while he was being asked questions both by the state as well as on cross-examination by the defense.

"For the record, the defense questioned, based on my timing, this witness for approximately over forty minutes or certainly close to forty minutes. When—there were times when I observed the witness he either raised his eyebrows, looked askance at counsel. He raised his eyebrows at certain critical times, like when he was cross-examined about not knowing the date of the shooting when the police asked him the date. He first didn't look at state's exhibits 9 and 14, then he looked at it, then he looked and looked away. He had gestures.

"When questioned about whether he could see the first step let alone the landing, he looked down. When asked how long he was selling drugs in Building 5, he looked up at the ceiling. Questioned about not telling the police that the name of the project was Greenes or something like that, yet he knew the name well, he closed his eyes. When asked about whether he was a womanizer, he didn't audibly do it but he sort of chuckled in his nonverbal expression. When questioned whether he wanted the jury to believe that he didn't know where this girl lived that he was seeing, he sat straight up.

"Again, he continued to make facial expressions, closing his eyes. He sighed when he was asked questions about Caroline [a woman at Greene Homes with whom, he told the police, he had been having sex] and that being the reason he went to Building 5, and saying that she was nice and straight. When asked about whether he indicated that [the victim] was the villain who went out of his way to raise trouble, he nodded and raised his eyebrows. Asked questions about whether he observed the victim go to the car to grab a gun and then start a conversation with Slim, he raised his eyebrows, sighed, and looked at defense counsel. And there were many instances where he did that.

"When he was questioned about not knowing [the defendant's] name as Nirone Hutchinson, he frowned. When asked about his plea agreement and plea deal to get cooperation for his testimony, he nodded and raised his eyebrows, and then when asked about whether he told the police he was smoking and what he was smoking, which was toward the end of the cross, he sighed again. So, there were many instances. I didn't capture them all, but certainly his body language is something from which the jury can assess his credibility."

We begin our discussion of the defendant's claim by setting forth the legal principles that govern our review. Although we review evidentiary rulings, including whether a statement is properly admitted pursuant to *Whelan*, under a deferential abuse of discretion standard; *State* v. *Simpson*, supra, 286 Conn. 643; whether the trial court properly concluded that the admission of Williams' videotaped statement to the police did not violate his confrontation clause rights under *Crawford* presents a legal question over which we exercise plenary review. *State* v. *George J.*, supra, 280 Conn. 592.

Generally, a statement made outside of court and offered at trial to establish the truth of the facts contained in that statement is hearsay and, therefore, presumptively inadmissible. Conn. Code Evid. §§ 8-1 and 8-2. There are, nevertheless, many exceptions to the hearsay rule. One such exception is set forth in § 8-5 of the Connecticut Code of Evidence, which incorporates and codifies a rule established in *State* v. *Whelan*, supra, 200 Conn. 753.

In *Whelan*, our Supreme Court rejected traditional, common-law application of the hearsay rule, pursuant to which courts admitted prior inconsistent statements only for impeachment purposes, and "adopted [a] rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination." (Footnote omitted.) *State* v. *Hopkins*, 222 Conn. 117, 123, 609 A.2d 236 (1992). The court in

*Whelan* explained: "[If] the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see *and hear* of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. . . . Quite simply, when the declarant is in court, under oath, *and subject to cross-examination before the factfinder concerning both his out-of-court and in-court statements*, the usual dangers of hearsay are largely nonexistent." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Whelan*, supra, 200 Conn. 750–51.

Section 8-5 of the Connecticut Code of Evidence codifies the *Whelan* rule, including later developments and clarifications of that rule. It provides in relevant part: "The following are not excluded by the hearsay rule, *provided the declarant is available for cross-examination at trial*: (1) . . . A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement." (Emphasis added.) As explained in the commentary to the rule, "[u]se of the word 'witness' in Section 8-5 (1) assumes that the declarant *has testified at the proceeding in question*, as required by the *Whelan* rule." (Emphasis added.) Conn. Code Evid. § 8-5 (1), commentary.

Even if hearsay evidence satisfies an exception to the hearsay rule, however, it may remain inadmissible in a criminal case unless it also comports with the confrontation clauses of the federal and state constitutions.[8] Conn. Code Evid. § 8-2 (b);[9] see also *California* v. *Green*, 399 U.S. 149, 155–56, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) (noting that "more than once [the court had] found a violation of confrontation [rights] even though the statements in issue were admitted under an arguably recognized hearsay exception").

In *Crawford* v. *Washington*, supra, 541 U.S. 68, the United States Supreme Court reexamined and refined its confrontation clause jurisprudence with respect to its limitations on the admission of hearsay evidence in criminal cases. Prior to *Crawford*, courts faced with deciding whether the admission of a hearsay statement would violate the confrontation clause followed the test

set forth in *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part by *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Under *Roberts*, hearsay statements by an unavailable declarant were constitutionally admissible provided that the statement had an "adequate indicia of reliability," which could be inferred by a court either on the basis of a "firmly rooted hearsay exception" or if the statement bore other "particularized guarantees of trustworthiness." Id. Thus, in practice, a defendant's confrontation rights were generally not implicated provided that a hearsay statement was admitted pursuant to a recognized statutory or common-law exception to the hearsay rule. The court rejected that approach in *Crawford*, overruling *Roberts*.

The court in *Crawford* reasoned that the cornerstone of a defendant's right to confrontation was *not* the reliability or trustworthiness of a statement, but the defendant's opportunity to question the declarant about the statement through cross-examination. It observed that hearsay statements fell into two broad categories: testimonial and nontestimonial.[10] The court held that, in a criminal trial, the confrontation clause prohibits the admission of testimonial hearsay statements by an unavailable declarant unless the defendant previously had an opportunity to cross-examine the declarant about the statement. The court made clear that if a declarant appears for cross-examination at trial, the confrontation clause "places no constraints at all on the use of [the declarant's] prior testimonial statements . . . so long as the declarant is present at trial to defend or explain it." (Citations omitted.) *Crawford* v. *Washington*, supra, 541 U.S. 60 n.9. Accordingly, pursuant to the confrontation clause, "[a witness'] testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

Turning to the present case, the defendant does not dispute that Williams' testimonial statement to the police was inconsistent with sworn testimony that Williams provided outside the presence of the jury that he "knew nothing," from which it reasonably could be inferred that he was claiming to know nothing about the shooting. There is also no dispute that the state sought to admit Williams' prior statement for the truth of the matters asserted therein, which included both Williams' identification of the defendant as the shooter and his explanation for why the defendant shot the victim, which directly undermined the defense's theory of the case that the defendant was justified in shooting the victim. The court considered all the relevant factors set forth in *Whelan*, including Williams' "availability" for cross-examination at trial and concluded that his prior inconsistent statement was made with personal

knowledge, properly recorded and authenticated, and, thus, was admissible hearsay under the *Whelan* rule.

The dispute on appeal is limited to whether the court properly rejected the defendant's argument that, due to Williams' refusal to provide verbal responses to any of the questions asked under oath by the prosecutor and by defense counsel, Williams was functionally unavailable, thus thwarting the defendant from any meaningful opportunity to cross-examine Williams about his prior statement, something that was necessary to satisfy both the *Whelan* rule and to protect his right to confrontation. Accordingly, we must first consider whether the defendant was denied an opportunity for cross-examination that implicated his right to confrontation, and then, if so, whether that constitutional violation was harmless beyond a reasonable doubt.

I

The United States Supreme Court has described the right of confrontation as composed of several elements: "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact . . . ." *Maryland* v. *Craig*, 497 U.S. 836, 846, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). Neither the United States Supreme Court nor any appellate court in this state has held that a witness' mere physical presence at trial on the witness stand is sufficient to satisfy a criminal defendant's right to confrontation. Such a holding would be inconsistent with the right to an adequate opportunity to cross-examine, an indispensable element of a defendant's right to confrontation. See *State* v. *Martinez*, 171 Conn. App. 702, 733–34, 158 A.3d 373 ("primary interest secured by confrontation is the right to cross-examination" and "if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony" [internal quotation marks omitted]), cert. denied, 325 Conn. 925, 160 A.3d 1067 (2017); 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1395, p. 150 ("[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*" [emphasis in original]).

"The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth." *Bishop* v. *Copp*, 96 Conn. 571, 575, 114 A. 682 (1921). Cross-examination "cannot be had except by the direct and personal putting of questions *and obtaining immediate answers*." (Emphasis added.) 5 J. Wigmore, supra, p. 150. "Ordinarily, a witness is regarded as subject to cross-examination when he is placed on the stand, under oath, *and responds willingly to questions*." (Emphasis added; internal quotation marks omitted.) *United States* v. *Owens*, 484 U.S. 554, 561, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). We certainly

are mindful that "the [c]onfrontation [c]lause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original; internal quotation marks omitted.) *Kentucky* v. *Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987). Further, "[t]he [c]onfrontation [c]lause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the [c]onfrontation [c]lause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware* v. *Fensterer*, 474 U.S. 15, 21–22, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). In other words, "[t]he [confrontation clause] does not bar admission of a statement so long as the declarant is present at trial *to defend or explain it*." (Emphasis added; internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 78.

Accordingly, the mere fact that a witness is called to the stand and placed under oath does not mean that the witness is necessarily available for cross-examination. In some circumstances, an otherwise available witness might render themselves unavailable by his or her actions on the witness stand. Although no appellate court in this state has squarely addressed whether a witness is "available for cross-examination" if he or she refuses outright to answer any questions after being sworn in to testify, courts in other jurisdictions that have considered this issue have concluded that such a witness is functionally unavailable and, therefore, the admission of a prior statement of that witness would violate the confrontation clause's guarantee of an opportunity to cross-examine. Although not binding on this court, we find these cases persuasive.[11] The state has not cited, nor has our own research revealed, any post-*Crawford* court decision expressly holding that a witness who takes the stand but then refuses to answer any questions despite having no valid right to refuse to answer the questions is available for cross-examination.[12]

In *Barksdale* v. *State*, 265 Ga. 9, 453 S.E.2d 2 (1995), the Georgia Supreme Court was presented with a situation quite similar to the one now before us. The defendant in *Barksdale* was charged with murder and armed robbery. The state called as a witness one of the defendant's accomplices, who already had pleaded guilty to armed robbery in exchange for the state's dropping the murder charge against him. The witness, who remained incarcerated, refused to testify at trial, believing that, by doing so, he would put his life in danger. After consulting with counsel, the trial court ruled that the witness did not have any valid fifth amendment privilege

to assert, and the court ordered him to testify. The witness nevertheless continued to refuse to answer any questions. The prosecutor asked the court to hold him in contempt, but the trial court declined to do so immediately. The state also moved to admit a videotaped statement that the witness previously had provided to the police. The court postponed ruling on the request to permit counsel time to research the issue. The next day, the state recalled the witness. The prosecutor asked the witness if he still refused to answer questions in light of a possible criminal contempt conviction. He continued to refuse to testify and was excused. The state renewed its motion to admit the prior videotaped statement, arguing that it was admissible for substantive purposes as a prior inconsistent statement under Georgia's version of the *Whelan* rule.[13] The defendant objected, arguing, inter alia, that the admission of the videotaped statement would violate his confrontation rights. The trial court nevertheless ruled that the videotaped statement was admissible as a prior inconsistent statement. The state recalled the witness to the stand and played the videotaped statement to the jury. At the conclusion of the videotape, the court permitted the defense to attempt to cross-examine the witness. Defense counsel asked the witness if he intended to continue to refuse to answer questions. The witness answered in the affirmative, and defense counsel indicated that he had nothing further to ask.

In his appeal of the conviction, the defendant in *Barksdale* claimed that the admission of the videotaped prior statement violated his right to confrontation because the witness was not subject to cross-examination regarding the prior statement. The Georgia Supreme Court unanimously agreed and reversed his conviction. In so doing, it distinguished for confrontation purposes the case before it, in which the witness refused to answer questions outright, from cases in which a witness had testified but asserted a lack of memory regarding a prior statement or the events at issue. In the latter line of cases, the court explained, the defendant had "the opportunity to cross-examine a forgetful witness about such matters as his bias, his lack of care and [attentiveness] . . . and even . . . the very fact that he has a bad memory." Id., 13, quoting *United States* v. *Owens*, supra, 484 U.S. 559. The court reasoned that unlike a witness who claims memory loss but nonetheless is willing to answer questions, the witness in the case before it had refused to provide *any* answers to questions, even in the face of a trial court's order to do so or be held in contempt and, thus, "was not available for cross-examination."[14]

The Pennsylvania Supreme Court reached a similar conclusion in *In re N.C.*, 629 Pa. 475, 105 A.3d 1199 (2014). In that case—a delinquency adjudication in which the juvenile was alleged to have committed a sexual assault on a three year old child—the court deter-

mined that a juvenile court had admitted a videotaped forensic interview of the minor victim in violation of the juvenile's right to confrontation. Although the victim, who was four years old at the time of the adjudication hearing, was found competent by the juvenile court to testify; id., 480; she was unable on direct examination to verbalize any responses to questions about the juvenile or his alleged contacts with her, although she did nod or shake her head in response to a few preliminary questions. Id., 480–81. After a number of unsuccessful attempts to elicit her testimony, the witness eventually became totally unresponsive and curled up into a fetal position.[15] Id., 487. The juvenile court inquired if defense counsel would like to ask her any questions, but defense counsel declined. Id.

Later in the proceeding, following the testimony of a forensic interviewer, the juvenile court admitted, over the objections of defense counsel, a DVD containing a previously recorded forensic interview of the witness. Id., 487–88. The juvenile objected on the grounds that the video constituted testimonial hearsay evidence and that its admission would violate his sixth amendment right to confrontation. Id. The juvenile court ruled that although there was no Pennsylvania case law defining what it means to testify in a proceeding, it concluded that the witness effectively had testified because she was found competent to testify and took the witness stand. Id., 488. The juvenile was adjudicated delinquent and appealed to the Superior Court.

The juvenile claimed on appeal that the admission of the witness' prior testimonial statement to the forensic interviewer was admitted in violation of *Crawford* because the witness had been unavailable for cross-examination at the adjudicatory hearing. Id., 489–90. The Superior Court agreed, concluding that the juvenile court had improperly found that the witness was available for sixth amendment purposes. It reversed the delinquency adjudication and ordered a new hearing. Id., 490.

The commonwealth was granted permission to appeal from the Superior Court's decision to the Pennsylvania Supreme Court. Id., 492. The commonwealth argued that the dispositive concern under the confrontation clause was not "the manner in which a witness performs during direct examination but rather whether the defendant was given the opportunity to conduct an effective cross-examination of that witness." Id., 494. The commonwealth contended that "a [witness'] evasiveness, refusal to cooperate, or lack of memory of certain events does not preclude a finding that a defendant's right to cross-examine that witness under the confrontation clause has been satisfied." Id. The juvenile responded that the United States Supreme Court has always required "meaningful participation in the courtroom proceeding before a witness may be deemed

available for cross-examination and that the [c]ommonwealth's arguments stand for the proposition that the mere presence of a witness in the courtroom will satisfy a defendant's constitutional right to confront that witness." Id., 497. The juvenile noted that the confrontation clause as interpreted by the United States Supreme Court "requires a witness who appears and takes the stand at trial *and willingly responds to questions.*" (Emphasis added.) Id.

The Pennsylvania Supreme Court unanimously agreed with the juvenile that his right to confrontation was violated and affirmed the decision of the Superior Court. Id., 504. The court explained: "[I]t is difficult to harmonize the juvenile court's ultimate determination at the adjudicatory hearing that [the minor witness] was available for cross-examination under the [s]ixth [a]mendment with its unequivocal statement on the record earlier that 'she's not going to testify' and its observation she did not testify on the substantive issues of the case. . . . Its contemporaneous courtroom observations also belie the juvenile court's characterization of [the witness'] behavior as merely 'less than forthcoming' . . . . [A] review of its explanation for its reasoning on the record suggests the juvenile court conflated the federal constitutional challenge that was before it—whether [the juvenile's] right to confrontation under the [c]onfrontation [c]lause of the [s]ixth [a]mendment had been satisfied—with the separate issues of [the witness'] competency to testify at the adjudicatory hearing . . . and of whether the forensic interview was admissible under [a statutory hearsay exception].

"We cannot find the confrontation element of *Crawford* was met herein, for *Crawford* and its progeny require an *opportunity* for effective cross-examination which [the juvenile] simply did not have. Contrary to the juvenile court's analysis, defense counsel's indication he had no questions on cross-examination cannot be deemed to have been a strategic choice, for any attempt on his part to continue to question this young witness whose fear and fragility were evident during direct examination and whose last expression before melding herself into a fetal position on her grandmother's lap was a desire to go home would have been, at best, pro forma. In addition, [the witness] did not act merely with trepidation at the hearing; she provided virtually no verbal responses on direct examination, despite two recesses and as many changes in caregivers to comfort her while she was on the witness stand which effectively left defense counsel with no opportunity to cross-examine her on the charges brought against [the juvenile].

"[The witness'] inability to speak and physical recoiling simply is not of the ilk of the witnesses in the caselaw to which the [c]ommonwealth cites who either

could not remember certain details or refused to cooperate with counsel. As such, the Superior Court correctly determined that the juvenile court improperly deemed [the witness] to have been available for cross-examination and that [the juvenile's] right to confront her guaranteed under the [c]onfrontation [c]lause of the[s]ixth [a]mendment to the United States constitution had been violated when it admitted her recorded statements, which were testimonial in nature, into evidence during [the juvenile's] adjudicatory hearing without [his] having had a prior opportunity to cross-examine her." (Citations omitted; emphasis altered.) Id., 503–504.

Finally, in *State* v. *Irlas*, 888 N.W.2d 709 (Minn. App. 2016), the Court of Appeals of Minnesota, was asked to determine, as a matter of first impression, whether a witness who took the stand and answered some preliminary questions, but then invoked his fifth amendment privilege and refused to respond willingly to questions about a prior guilty plea statement, was not available for cross-examination for purposes of the confrontation clause. Id., 713. The court concluded that, although the witness' invocation of his fifth amendment right on the stand was invalid, it nevertheless rendered him unavailable for cross-examination, and the subsequent admission of his prior plea transcript violated the defendant's rights under the confrontation clause. Id. The court explained that, by refusing to respond to questions, the witness "did not testify . . . making him not subject to cross-examination under *Crawford*." Id., 714.

On the basis of the preceding case law and our careful consideration of confrontation clause jurisprudence as it exists post-*Crawford*, with its emphasis on the significance of a defendant's right to cross-examine a declarant about any out-of-court testimonial statement that the state seeks to admit against the defendant for substantive purposes, we conclude that Williams' videotaped statement to the police was admitted in violation of the defendant's constitutional right to confrontation. Although Williams was called to the stand and put under oath before the jury, he outright refused to give any verbal responses to questions asked of him. Although both the prosecutor and the defense counsel were permitted to ask Williams a series of questions, merely posing questions is not the equivalent of cross-examination; the defendant is also entitled to answers, whatever they may be. If a witness does not provide even a single answer while on the witness stand, the defendant is completely deprived of any opportunity he might have to probe and expose infirmities in the witness' prior statement or even the reasons behind the witness' recalcitrance or lack of memory. Williams' outright refusal to respond to any questions rendered him unavailable for cross-examination, and because the defendant never had any other opportunity to cross-examine Williams

about his statement to the police prior to trial, admission of that statement violated *Crawford*.

Our conclusion that Williams was unavailable for purposes of cross-examination is consistent with the Federal Rules of Evidence regarding criteria that render a witness unavailable under the federal rules for purposes of admitting hearsay statements. Rule 804 (a) of the Federal Rules of Evidence provides in relevant part: "A declarant is considered to be unavailable as a witness if the declarant . . . (2) refuses to testify about the subject matter despite a court order to do so . . . ." As this court has previously noted, prior to the adoption of the Connecticut Code of Evidence, our Supreme Court has cited with approval rule 804 in determining whether a declarant was unavailable as a witness. See *State* v. *Richard P.*, 179 Conn. App. 676, 687 n.11, 181 A.3d 107, cert. denied, 328 Conn. 924, 181 A.3d 567 (2018), citing *State* v. *Bryant*, 202 Conn. 676, 694, 523 A.2d 451 (1987). Here, despite the court's order that he answer questions, Williams refused to provide any information about the "subject matter," which here meant any information about the shooting or about the circumstances surrounding his videotaped statement to the police.

In reaching its contrary conclusion that the defendant's confrontation rights were not violated on the basis of Williams' outright refusal to respond to questions, the court relied on a line of cases in which a witness' prior statement was deemed properly admitted despite the witness' claimed lack of memory either about the statement and/or the events in question. See *State* v. *Cameron M.*, supra, 307 Conn. 504; *State* v. *Simpson*, supra, 286 Conn. 634; *State* v. *George J.*, supra, 280 Conn. 551; *State* v. *Pierre*, supra, 277 Conn. 42; *State* v. *Rodriguez*, supra, 139 Conn. App. 594; *State* v. *Eaton*, supra, 59 Conn. App. 252. For purposes of the confrontation clause analysis now before us, however, we conclude, as did the court in *Barksdale* v. *State*, supra, 265 Ga. 12–13, that cases involving a witness with memory loss, whether real or feigned, are sufficiently distinguishable from the circumstances of the present case to render their holdings inapposite. See also *People* v. *Foalima*, 239 Cal. App. 4th 1376, 1390–91, 192 Cal. Rptr. 3d 136 (2015) ("[An] opportunity [to cross-examine] may be denied if a witness refuses to answer questions, but it is not denied if a witness cannot remember. A witness who refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness. . . . By contrast, a witness who suffers from memory loss—real or feigned—is considered subject to cross-examination because his presence and responses provide the jury with the opportunity to see [his] demeanor and assess [his] credibility." [Citations omitted; internal quotation marks omitted.]). It is helpful to briefly discuss this line

of cases before explaining why they are not controlling under the circumstances of the present case.

The earliest case cited by the trial court was *State* v. *Eaton*, supra, 59 Conn. App. 252, a case decided by this court prior to *Crawford*. In *Eaton*, we held that a witness' written statement to the police properly was admitted as a full exhibit under *Whelan* despite the fact that the witness, when called to testify at trial, indicated that she could not recall making the statement. Id., 264. Specifically, the record on appeal showed that after the witness was called to testify, she was shown the statement that she previously had given to the police. The witness, in response to questioning, indicated that although she recognized the signature on the statement as being her own, she did not recall making the statement. The statement was then admitted into evidence under *Whelan* over the objection of the defendant. The defendant was permitted to cross-examine the witness, and "probed into the circumstances under which she gave her statement to the police, including how she got to the police station, how long she was there, how she was questioned, who questioned her, how she answered the questions and whether the police had [identified the perpetrator]." Id., 258. This court concluded on appeal that the defendant's sixth amendment right to confrontation was not violated because, despite the claim of lack of memory, the defendant had a meaningful opportunity to cross-examine the witness while she was on the witness stand. We explained: "Although [the witness] was uncooperative for the defense as well as for the state in failing to recall her statement to the police even after she was given the opportunity to review it, she did describe in some detail the circumstances of when she gave her statement to the police. She was able to recall that she signed and initialed the statement after it was read to her and that she was present at the club at the time of that incident. Significantly, she testified that the contents of her statement . . . were truthful." Id., 266.

In *State* v. *Pierre*, supra, 277 Conn. 42, our Supreme Court rejected the defendant's claim on appeal that the trial court improperly admitted a witness' prior written statement to the police because the witness was functionally unavailable for cross-examination at trial and the defendant had not had any prior opportunity to cross-examine the witness about the statement. The defendant argued that although the witness had taken the stand at trial and answered questions, he was functionally unavailable because he claimed that he "could not remember ever having heard any of the information recounted in the written statement, that he never had substantively reviewed the statement, and had signed the document only to stop the police from harassing him . . . ." Id., 79. The Supreme Court agreed with the state that the defendant's confrontation right to cross-examination was not violated because the witness "took

the stand at trial, agreed to testify truthfully, was subject to cross-examination by the defendant, and *answered all questions posed by defense counsel.*" (Emphasis added.) Id., 84. The witness asserted in response to questions that he had no memory of the details contained in his signed statement to the police. The court noted, however, that the witness "acknowledged meeting with the detectives in his attorney's office and signing the written statement prepared by the investigating officers. Additionally, [the witness] responded to several questions regarding his motives and interest in providing information to the police. . . . [The witness] stated that he had signed the written statement despite the fact that it was not accurate, because the police had contacted him on several occasions and he was interested in trying to get them to stop bothering him. Moreover, [the witness] confirmed several other pieces of information contained in the statement . . . ." Id., 84–85. In sum, the court held that "a witness' claimed inability to remember earlier statements or the events surrounding those statements does not implicate the requirements of the confrontation clause under *Crawford*, so long as the witness appears at trial, takes an oath to testify truthfully, *and answers the questions put to him or her during cross-examination.*" (Emphasis added.) Id., 86. Later that same year, in *State* v. *George J.*, supra, 280 Conn. 551, our Supreme Court, citing *Pierre*, reiterated that the fact that a testifying witness claimed to have no recollection of the contents of a past statement did not render the witness unavailable for *Crawford* purposes. Id., 596.

In 2008, our Supreme Court decided *State* v. *Simpson*, supra, 286 Conn. 634. The defendant in *Simpson* had been convicted, inter alia, of sexually assaulting a minor. During trial, the court had admitted into evidence for substantive purposes under *Whelan* portions of a videotaped forensic interview of the victim, after the victim testified at trial that she did not remember the defendant touching her body in the way she described in the video. One of the defendant's claims on appeal was that the witness' lack of memory of the events rendered her functionally unavailable for cross-examination under *Crawford*. Relying on its prior decisions in *Pierre* and *George J.*, the court upheld the admission of the videotape. In so doing, the court noted that the defendant "cross-examined [the witness] extensively about her memory and perception . . . ." Id., 654. Further, with respect to the specific allegations contained in the videotaped statement, "the defendant also cross-examined [the witness] extensively and elicited testimony that she had never seen a man or boy without his clothing on, and that she did not remember participating in the videotaped interview or making the accusation that the defendant had touched her with his penis, that she got in trouble when she was younger for touching herself, and that she was not afraid of the

defendant. Finally, the defendant was able to utilize this information in his closing arguments to the jury. Accordingly, we conclude that the defendant had an ample opportunity to cross-examine [the witness] effectively, and, therefore, his confrontation clause rights were not violated by the admission into evidence of the videotaped statement." Id., 654–55.

In *State* v. *Cameron M.*, supra, 307 Conn. 504, the Supreme Court rejected a claim nearly identical to the one raised in *Simpson*, namely, that the child sexual assault victim was functionally unavailable for cross-examination for purposes of *Crawford* because she testified at trial during direct examination that she could not remember anything regarding the forensic interview or the allegations at issue. Id., 515–16. The court indicated that to the extent the defendant was claiming that the witness was functionally unavailable solely due to her lack of memory, that claim was controlled by its holding in *Simpson*. Further, the court noted that the defendant had elected not to cross-examine the witness and, thus, any lack of cross-examination was the result of "a strategic election by the defendant . . . ." Id., 520. The fact that "the victim could have been cross-examined on, for example, her memory and understandings of truth and fantasy was sufficient to render her available for confrontation purposes under *Crawford*." (Emphasis omitted.) Id.

The circumstances of the present case render it distinguishable from *Pierre* and its progeny. In each of those cases, the witness willingly provided some responses to the questions asked when called to testify. Although the witnesses in the cases cited by the trial court claimed or feigned memory loss regarding the information provided in the statement or of making the statement at all, they nevertheless responded verbally to questioning, providing some relevant information from which the jury, in combination with the witness' demeanor, could evaluate whether to believe the facts of the statement or the witness' trial testimony. In the present case, Williams did not respond in any way to any of the questions asked. He did not assert whether he had or had not made the statement at issue, whether he remembered the contents of the statement or the events contained therein. He simply failed to provide any testimony. Contrary to the position that the state now takes on appeal, at trial, the prosecutor seemed to understand that it was essential that Williams provide verbal responses to questions. When Williams stated, outside the presence of the jury, that he was not "answering no questions," the prosecutor told him that he could say that in response to each question he was asked.

The utter lack of a verbal response to any questions renders the present case wholly unlike the cases that the trial court relied on in admitting Williams' prior

statement. The trial court, in rendering its ruling, indicated that the availability required under both *Crawford* and *Whelan* was satisfied simply from the witness' physical presence and the jury's ability to assess his demeanor and body language "*in responding to questions*." (Emphasis added.) Williams, however, never responded to a single question asked of him before the jury, remaining silent throughout. In its analysis of whether Williams' refusal to answer questions rendered him functionally unavailable to testify, the trial court also appeared to conflate that question with whether a prior statement could be considered inconsistent if a witness failed to respond to questions.

It certainly is within the province of the jury in its role as fact finder to assess the credibility of a witness' answers to questions by assessing the witness' demeanor on the stand, which would include how a witness looks and acts while testifying. In the present case, the trial court stated on the record its own observations of Williams while he was on the stand, including, inter alia, that Williams had looked up at the ceiling, looked down, raised his eyebrows, closed his eyes, and "sort of chuckled in his nonverbal expression." The court did not make any finding, however, that Williams intended any of his gestures or body language to convey a specific nonverbal response to a question that would amount to a yes or no. We agree with the defendant that the meaning of the court's observations of Williams, *which were completely unconnected to verbal responses to questions*, is ambiguous and far too speculative to be considered as the equivalent of testimony. In other words, body language and demeanor are only instructive in assessing the credibility of testimony actually given, and are not a substitute for verbal responses or nonverbal responses intended to convey a substantive response to a question.[16]

Our reasoning is consistent with observations made by the United States Court of Appeals for the Second Circuit in upholding a District Court's ruling that it did not implicate confrontation rights for a witness to testify while wearing dark sunglasses. The Second Circuit noted: "Even if we accept the idea, *grounded perhaps more on tradition than on empirical data*, that demeanor is a useful basis for assessing credibility, the jurors had an entirely unimpaired opportunity to assess the delivery of [the witness'] testimony, notice any evident nervousness, and observe her body language. *Most important*, they had a full opportunity to combine these fully observable aspects of demeanor *with their consideration of the substance of her testimony*, assessing her opportunity to observe, the consistency of her account, any hostile motive, and all the other traditional bases for evaluating testimony." (Emphasis added; footnotes omitted.) *Morales* v. *Artuz*, 281 F.3d 55, 61–62 (2d Cir.), cert. denied sub nom. *Morales* v. *Greiner*, 537 U.S. 836, 123 S. Ct. 152, 154 L.

Ed. 2d 56 (2002).

In sum, because of Williams' refusal to provide any verbal responses to questions he was asked by both the prosecutor and defense counsel, and absent anything more than speculation as to the nonverbal mannerisms observed by the trial court, we conclude that the defendant was deprived of an opportunity to cross-examine Williams regarding his prior videotaped statement to the police. Because he admittedly had no prior opportunity to cross-examine Williams, the statement was inadmissible under *Crawford*.[17]

## II

Our conclusion that the court violated the defendant's rights under the confrontation clause by admitting Williams' prior videotaped statement into evidence without an opportunity for cross-examination does not end our inquiry. We must also consider whether the defendant was harmed by this error. See *Delaware* v. *Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (stating that confrontation clause violations are subject to harmless error analysis). Because the error is constitutional in magnitude, "the state has the burden of proving [that] the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 384, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). We conclude that the state has failed to meet that high burden in the present case.

In Williams' videotaped statement, he identified the defendant as the shooter. If the identification had been the only inculpatory information conveyed by Williams in his statement, its subsequent admission at trial likely would have been harmless in light of the defendant's decision to admit that he shot the victim, but that he did so in defense of his friend, Slim. In his prior statement, however, Williams also provided information that, if credited, significantly undercut the defendant's claim that he shot the victim in defense of Slim.

"[General Statutes] § 53a-19 provides for two separate, but related, defenses—self-defense and defense of others . . . ." *State* v. *Bryan*, 307 Conn. 823, 833, 60 A.3d 246 (2013). "The defense of others, like self-defense, is a justification defense. These defenses operate to exempt from punishment otherwise criminal conduct when the harm from such conduct is deemed to be outweighed by the need to avoid an even greater harm or to further a greater societal interest. . . . Thus, conduct that is found to be justified is, under the circumstances, not criminal." (Internal quotation marks omitted.) Id., 832–33. "Under . . . § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise . . . deadly force if he reasonably believes both that [the] attacker is using or about to use deadly force against [himself or a third person] and that deadly

force is necessary to repel such attack." (Internal quotation marks omitted.) Id., 835–36. Unlike an affirmative defense, the defendant has no burden of persuasion for a claim of defense of others, only a burden of production. Id., 834. In other words, once the defendant has adduced evidence to raise a reasonable doubt in the mind of a rational juror as to whether he acted in defense of another, the state has the burden to prove beyond a reasonable doubt that the defendant's actions were unjustified. Id., 832; *State* v. *Hall-Davis*, 177 Conn. App. 211, 224, 172 A.3d 222 (jury's duty to ascertain "whether the state has met its burden of proving beyond a reasonable doubt that the [crime] was not justified" [internal quotation marks omitted]), cert. denied, 327 Conn. 987, 175 A.3d 43 (2017).

The defendant testified before the jury that, at the time he shot the victim, the victim was physically assaulting his friend, Slim, that the victim was much taller and significantly heavier than Slim, and that the victim was armed with a handgun and was pistol-whipping Slim. Significantly, aspects of the defendant's account were corroborated by other evidence. The state's medical examiner testified that the victim was six feet, eight inches tall and weighed about 400 pounds. Detective Michael Fiumidinisi, who initially investigated the shooting, testified that Slim was six feet, two inches tall, from which the jury could infer that he was smaller than the victim. More importantly, Fiumidinisi testified, without objection, about statements that the victim made to him at the hospital, many of which corroborated the defendant's narrative of the events just prior to the shooting. For example, the victim stated to the detective that he had followed Slim when Slim tried to leave the lobby, that he was trying to intimidate Slim, and that he pulled him down the stairs and was engaged in a fistfight with Slim when he was shot from behind.

Williams' videotaped statement to the police was the only other evidence presented from an eyewitness of the shooting. The significance of his statement cannot be downplayed given that prior to that statement, there was insufficient evidence to establish probable cause for the defendant's arrest. Williams told the police that the defendant was part of the group that controlled drug sales in Building 5. Williams indicated that the defendant knew that the victim was selling fake drugs, which adversely affected the defendant's drug business. It can be reasonably inferred from Williams' statement that this knowledge motivated the defendant to confront and ultimately shoot the victim. If the jury believed Williams, this would have cast serious doubt on the veracity of the defendant's version of events, namely, that he and Williams were initially attacked by the victim and his friends, and that he had shot the victim only to prevent him from seriously injuring Slim, who had come to their aid. Without Williams' alternate ver-

sion of events, which put the defendant's encounter with the victim into a different context, the only evidence before the jury would have been the account given by the defendant, which, as we have set forth, was corroborated by other evidence.

The state argues that the defendant's testimony was "inconsistent and patently incredible." Moreover, the state contends that the defendant's claimed justification for using deadly force was "internally inconsistent, contrary to common sense and arguably legally insufficient, even viewed in a light most favorable to him." According to the state, even if the jury credited the defendant's version of events, the jury was "unlikely to have found that the scenario he posited, whereby neither he nor any of his friends made any effort to assist Slim in stopping the victim by using nonlethal force, justified his actions." In short, the state takes the position that the defendant's defense of others claim was so "fraught with problems that the jury could not have overlooked" that any improper admission of Williams' statement was rendered harmless.

Although we acknowledge that, as the state suggests, there were potential problems with the defendant's theory of defense and there is no *guarantee* that the jury would have found the defendant not guilty on that basis in the absence of the erroneous admission of Williams' statement, the state's arguments are insufficient to satisfy its demanding burden of demonstrating harmlessness beyond a reasonable doubt. First, however technically weak the defendant's claim of defense of others might have been, it was sufficiently supported by both law and fact that the court agreed to give the jury an instruction on the defense of others. The state does not argue that the defendant was not entitled to the instruction. Second, and more importantly, the introduction of Williams' statement provided the jury with evidence of a clear and alternative motive on the part of the defendant to shoot the victim that, if credited, effectively obliterated any need for the jury to consider the defendant's justification defense.

Contrary to the position taken by the state, we conclude that it was reasonably likely that Williams' statement played a significant role in the jury's decision to disregard the defendant's justification defense, and, therefore, the improper admission of Williams' statement and its effect on the jury cannot be viewed as harmless beyond a reasonable doubt.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI. "[T]he sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks

omitted.) *State* v. *Holley*, 327 Conn. 576, 593, 175 A.3d 514 (2018).

[2] The defendant also claims on appeal that the court improperly admitted evidence of his gang affiliation and prior gun trafficking activities, which the defendant characterizes as inadmissible evidence of uncharged misconduct. See Conn. Code Evid. § 4-5 (a). Because we conclude that the defendant is entitled to a new trial on his other claim of error, and it is speculative whether the uncharged misconduct issue will arise again on retrial, we decline to review this additional claim of error.

[3] At trial, the state presented testimony from a police sergeant familiar with gang activities at the Greene Homes housing complex. He explained that the five Greene Homes buildings were controlled by several different groups, and that violence often broke out if one group tried to sell drugs to another group's customers. He also explained that if someone sold fake drugs in a building, it would result in both a loss of revenue and reputation for the group that controlled the building, and that the group would seek retribution against such an offender.

[4] In addition to the murder, the state initially charged the defendant with one count of criminal possession of a firearm in violation of General Statutes § 53a-217 and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The state later chose not to pursue those additional charges, filing a substitute information limited to the murder charge.

[5] We note that this defense strategy was in place prior to trial and prior to the admission of Williams' statement identifying the defendant as the person who shot the victim. The defendant submitted pretrial written requests to charge that included an instruction on self-defense and the defense of others.

[6] General Statutes § 53a-19 (a) codifies defense of others and provides in relevant part: "[A] person is justified in using reasonable physical force upon another person to defend . . . a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

[7] The court stated: "Yesterday, I held Mr. Williams in contempt for his entire conduct yesterday. I told him I'd be bringing him back today. I advised him that, under *Whelan*, given the responses he had given yesterday, that— and the inconsistencies, that, in all likelihood I would take a look at the case law, but his statement to the police back on July 4th would likely be shown to the jury, and he had a choice to answer questions or not answer questions; and by not answering questions and his gestures and facial expressions, that is a part of testimony for which the jury could assess whether his position today, which is inconsistent from that of July 4, 2013, is the truthful one or the statement he gave back on July 4th. They can assess all of it; the questions he was posed both by the state and on cross-examination, his expressions—and I'll make a record of some of those in a moment.

"But given that, Mr. Williams, I understand the predicament that you're in.

"But what I'm going to do is, in light of his conduct today, which was respectful, I'll vacate the contempt, and he'll resume whatever time he has and then he's on his own, obviously, as far as recommendation. But I'll vacate the contempt."

[8] The defendant in the present case has not raised a claim under the state constitution. Nevertheless, we note that "our Supreme Court has interpreted Connecticut's confrontation clause to provide the same protections as its federal counterpart. . . . [W]ith respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the United States constitution. The provisions have a shared genesis in the common law. . . . [T]he principles of interpretation for applying these clauses are identical." (Citations omitted; internal quotation marks omitted.) *State* v. *Jones*, 140 Conn. App. 455, 474–75, 59 A.3d 320 (2013) (rejecting claim that confrontation clause of our state constitution provides greater protections than its federal counterpart), aff'd, 314 Conn. 410, 102 A.3d 694 (2014).

[9] Section 8-2 (b) of the Connecticut Code of Evidence provides: "In criminal cases, hearsay statements that might otherwise be admissible under one of the exceptions in this Article may be inadmissible if the admission of such statements is in violation of the constitutional right of confrontation."

[10] Hearsay statements that are nontestimonial in nature do not implicate the confrontation clause; rather, their admissibility is governed solely by the rules of evidence. See *State* v. *Slater*, 285 Conn. 162, 169–70, 939 A.2d

1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008). Although *Crawford*'s failure to precisely define what it meant by "testimonial" has resulted in an abundance of litigation on that subject; id., 171; the parties in the present appeal agree that the videotaped police interview of Williams was testimonial in nature and, thus, implicates *Crawford*. See *Crawford* v. *Washington*, supra, 541 U.S. 52 ("[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard").

[11] "[T]he contours of the post-*Crawford* jurisprudence regarding unavailability for Confrontation Clause purposes—especially as unavailability relates to refusal to testify—are emerging." *State* v. *Kitt*, 284 Neb. 611, 629, 823 N.W.2d 175 (2012).

[12] We note that in *Fowler* v. *Indiana*, 829 N.E.2d 459 (Ind. 2005), cert. denied, 547 U.S. 1193, 126 S. Ct. 2862, 165 L. Ed. 2d 898 (2006), the issue before the Indiana Supreme Court was "whether a witness who is present and takes the stand, but then refuses to testify with no valid claim of privilege, is a witness who 'appears for cross-examination' (as that term is used in *Crawford*) if no effort is made to compel the witness to respond." Id., 465. The court, in a scholarly and historical discussion of the issue, first noted that, pre-*Crawford*, although a witness who asserted an inability to recall any significant information was deemed available for cross-examination under existing United State Supreme Court precedent, some courts nevertheless held that a witness who refused to answer any questions on the stand was not available for cross-examination for confrontation purposes. Id., 466–67. The court in *Fowler* concluded that it was unnecessary to decide the confrontation issue post-*Crawford* because it concluded that the defendant had forfeited any right to confrontation by making no effort to compel the witness' testimony. The court explained: "A refusal to answer, even after a court order, arguably falls on the loss of memory side of the line. Unlike a privilege that, as in *Crawford*, prevents the witness from taking the stand, the refusing witness, like the amnesiac, is before the jury. The basis for the refusal and the [witness'] demeanor can be taken into account in evaluating the prior statement just as the loss of memory can be evaluated by the trier of fact. On the other hand, a simple refusal to answer may be viewed as barring the defendant's access to meaningful cross-examination. We believe we need not resolve this issue because here [the defendant] did not seek an order compelling a response. . . . [W]e think a request for an order directing the witness to respond is necessary to preserve a [c]onfrontation [c]lause objection to prior statements by the witness." Id., 467.

[13] See *Gibbons* v. *State*, 248 Ga. 858, 862–64, 286 S.E.2d 717 (1982).

[14] We note that because *Barksdale* was decided prior to the United States Supreme Court's decision in *Crawford*, the court, in analyzing whether the defendant's right to confrontation was violated, applied the former trustworthiness standard set forth in *Ohio* v. *Roberts*, supra, 448 U.S. 56. The court's finding that the witness was not available for cross-examination, however, necessarily would have led to the same result under *Crawford*'s new standard. Other courts have reached the same conclusion reached in *Barksdale* under pre-*Crawford* jurisprudential standards. See, e.g., *People* v. *Rios*, 163 Cal. App. 3d 852, 864, 210 Cal. Rptr. 271 (1985) ("we find the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness").

[15] As the Pennsylvania Supreme Court noted in its decision, the juvenile court took two recesses and made changes in the caregivers who sat with the witness on the stand in an effort to make the witness more comfortable, to no avail. *In re N.C.*, supra, 629 Pa. 497.

[16] The cases the state relies on to support its assertion that nonverbal conduct by a witness properly could be viewed as testimony are limited to instances of nodding and shaking of the head in lieu of a verbal response of yes and no.

[17] Our decision today is to be read as limited to the unique set of circumstances present in this case. We are cognizant of the reality that the state has limited control over recalcitrant and noncooperating witnesses. Nevertheless, this concern is overborne by our duty to adhere to existing confrontation jurisprudence, which seeks to ensure that only testimonial hearsay evidence that has been subjected to a reasonable opportunity for cross-examination is admitted against a defendant.