******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TAMARA GORDON
## (AC 42039)

Alvord, Prescott and Cradle, Js.

*Syllabus*

Convicted of the crime of larceny of an elderly person by embezzlement in the second degree in connection with certain credit card transactions, the defendant appealed to this court. The defendant was a health care aide who lived part-time with the alleged victim, R, and his wife. Eventually, the defendant and R became romantic and intimate. R gave the defendant large sums of money, and, according to the defendant, authorized the use of his credit card to make purchases for the defendant's own personal needs. After R's health declined, his son, B, hired a bookkeeper to help R manage his finances. When the bookkeeper found certain credit card charges and checks written to the defendant, the defendant's employment was terminated. B filed a complaint with the police, who conducted a larceny investigation, during which a detective, S, interviewed R. Prior to trial, R died, and the court granted a motion in limine filed by the defendant to preclude the admission of statements made by R to any law enforcement agent. At trial, S testified that he met with R and that R consented to the investigation. On appeal, the defendant claimed that the trial court improperly admitted into evidence a testimonial hearsay statement of R in violation of her constitutional right to confrontation and that she was deprived of her due process rights when the prosecutor engaged in prosecutorial impropriety by making substantive use of the testimonial hearsay statement in her closing rebuttal argument. *Held*:

1. The trial court violated the defendant's right to confrontation under the federal constitution by admitting into evidence, without limitation, S's testimony that R consented to the larceny investigation, which constituted hearsay: R's consent to the larceny investigation was an out-of-court statement, and, although S did not repeat any of the specific words that R spoke during his interview with S, S's testimony presented to the jury, by implication, the substance of R's statements during the interview, that, after being informed of the nature of the investigation into the defendant's conduct, R communicated to S that the police had his permission to continue to pursue the larceny investigation because the transactions were unauthorized; moreover, R's statement of consent was admitted for the truth of the matter asserted, as the court indicated to the parties that it would admit the statement even if it were hearsay in that it was akin to a dying declaration, the court admitted the statement at issue without limitation, which meant it could be used for any purpose, and the prosecutor's closing rebuttal argument that the jury should infer that the defendant made unauthorized purchases with R's credit card because otherwise R would not have consented to the police investigation was a powerful indicia that the parties and the court understood that R's statement of consent was admitted for substantive purposes; furthermore, R's statement was testimonial in nature because the state conceded it would be if it came in for substantive purposes and it was provided amidst an interrogation to establish or to prove past events potentially relevant to later criminal prosecution, and the defendant did not previously have the opportunity to cross-examine R, who was unavailable due to his death; additionally, the defendant was harmed by the error, because the circumstances of the trial suggested that the admission of S's testimony influenced the judgment of the jury in that R effectively testified against the defendant on this critical issue from the grave without ever having been subjected to cross-examination, the jury had been presented with evidence that R had often gifted the defendant money and that the state did not charge the defendant for the theft of those funds, and, less than ten minutes after the jury reheard S's testimony, it returned a guilty verdict.

2. Because this court concluded that the trial court improperly admitted R's testimonial statement for substantive purposes, in contravention of the defendant's constitutional right to confrontation, it did not need to

reach the merits of the defendant's prosecutorial impropriety claim.

Argued January 6—officially released July 20, 2021

*Procedural History*

Substitute information charging the defendant with the crime of larceny of an elderly person by embezzlement in the second degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed*; *new trial.*

*Megan L. Wade*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Melissa E. Patterson*, senior assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Justina Moore*, assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Tamara Gordon, appeals from the judgment of conviction, rendered following a jury trial, of larceny of an elderly person by embezzlement in the second degree in violation of General Statutes §§ 53a-119 (1) and 53a-123 (a) (5). On appeal, the defendant claims that (1) the court improperly admitted into evidence a testimonial hearsay statement of the alleged victim, Robert Duke, Sr. (Duke), who died prior to trial, in violation of the defendant's right to confrontation under the sixth amendment to the United States constitution[1] and article first, § 8, of the Connecticut constitution,[2] and (2) she was deprived of her due process rights when the prosecutor engaged in prosecutorial impropriety by making substantive use of Duke's testimonial hearsay statement in her closing rebuttal argument. Because we conclude that the court improperly admitted Duke's testimonial statement for substantive purposes, in contravention of the defendant's right to confrontation, we do not need to reach the merits of the defendant's prosecutorial impropriety claim. Accordingly, we reverse the judgment of conviction and remand for a new trial.

The following facts, as presented to the jury, and procedural history are relevant to our review of the defendant's claims. For approximately thirty-eight years, Duke, a lawyer, and his wife, Jeanette Duke,[3] lived together in their family home in Wilton where they raised four children. Jeanette Duke developed a degenerative neurological disorder and eventually required around-the-clock care. To assist with Jeanette Duke's care, Duke hired two live-in health care aides, Tina Grigoryan, who was responsible for Jeanette Duke's care from Monday morning until Saturday morning, and the defendant, who was responsible for Jeanette Duke's care from Saturday morning until Monday morning. The aides' responsibilities included, inter alia, purchasing groceries, household items, and personal items for the Dukes. For such purchases, Duke authorized the aides to use his credit card, which was kept in a designated kitchen drawer.

Duke was generous to his employees. Grigoryan and the defendant were well compensated, earning between $400 and $500 per day and regular bonuses. Duke loaned Grigoryan money on at least two occasions for eye surgery and a personal family matter. Duke also assisted the defendant with a business endeavor that ultimately was unsuccessful, by drafting the requisite legal documents, connecting the defendant with an attorney, and providing funds.

According to the defendant, in April, 2010, her relationship with Duke became romantic and intimate. At that time, Duke was in his early eighties and the defendant was in her early thirties. The defendant testified that Duke's generosity increased in tandem with the intimacy of the relationship, and that he made sure she did not "want for

anything at all." At a certain point, the Dukes' children became upset about the amount of money their father was providing to the defendant. In March, 2012, Ben Duke, Duke's son, met with the defendant and his father to present information that he thought would demonstrate that the defendant was making misrepresentations to his father. After that conversation, the defendant quit working for the Dukes. Duke wrote the defendant a $10,000 severance check.

Approximately three weeks later, the defendant returned to work for the Dukes at Duke's request. When the defendant returned to work, Duke continued to give her large sums of money in addition to her daily pay, in the form of checks designated for a Health Reimbursement Account (HRA).[4] The defendant testified that she used Duke's credit card to make purchases for her own personal needs and that Duke was aware of, and authorized, those purchases.

Ben Duke testified that Duke's health declined significantly in late 2012, and he began to need additional assistance. In March, 2013, the Dukes moved to an independent living facility in Redding, at which the aides continued to provide care for them pursuant to the same schedule— Grigoryan during the week and the defendant on the weekends. In August, 2013, Ben Duke hired Beth Wagner, a bookkeeper, to help his father manage his finances. Upon reviewing eight months of Duke's credit card statements, from January through September, 2013, Wagner found that there were $7371.43 worth of weekend charges at CVS Pharmacy, $4197.57 at T.J. Maxx, and $7812.30 at Stop & Shop. Duke had written checks to pay these credit card bills. Wagner also determined that, in 2013, Duke wrote the defendant a number of HRA checks totaling $78,446.43. On September 7, 2013, shortly after Wagner presented her findings to Ben Duke and Duke, the defendant's employment was terminated.

On September 13, 2013, Ben Duke filed a complaint with the Wilton Police Department regarding approximately $23,000 in suspicious weekend transactions on Duke's credit card from January through September, 2013. The Wilton police then conducted a larceny investigation, during which the police detective assigned to the case, Robert Scott Sear, interviewed Duke. The defendant was arrested in 2014, and later charged, by an amended long form information, with larceny of an elderly person by embezzlement in the second degree, in violation of §§ 53a-119 (1)[5] and 53a-123 (a) (5).[6] Duke died in October, 2014, approximately three and one-half years before trial.

Prior to trial, the defendant filed a motion in limine to preclude the admission of statements made by Duke to "any law enforcement agent," in which she argued that any statements made to the police were inadmissible testimonial hearsay. At the hearing on the motion in limine, the court asked the state if it intended to offer any hearsay testimony regarding statements of Duke. The state's

response was that it would follow the rules of evidence, it did not plan to claim any exceptions to the hearsay rule that would apply to Duke's statements, and it would notify opposing counsel if it found "some crazy exception that [it] think[s] would be useful . . . ." The court granted the defendant's motion in limine, explaining that its decision was based on the prosecutor's representation that she would not be offering any testimony regarding hearsay statements of Duke.

The defendant later filed a motion to suppress certain evidence obtained from the stores at which the defendant had used Duke's credit card to make personal purchases. At the hearing on the motion to suppress, Detective Sear testified regarding, inter alia, his interview with Duke. Specifically, he stated, "I went to Yale New Haven Hospital, spoke to [Duke], met with him on normal rapport. He had a very weak voice. He obviously was partially blind. He could not write, but he was aware of his surroundings. He was alert. He was oriented. He agreed to speak with me. I thought the interview was appropriate. His son with power of attorney was present and I began to speak to him about why I was there.

"He explained that he knew and understood why I was there, and then I began to ask him questions about these certain transactions in which he did explain that there were some food items that may have been purchased. It would be difficult for him to isolate those, *but the items of gift card transactions, he was insistent that he never authorized such purchases and he never authorized any purchases within the T.J. Maxx store purchases that were used.*" (Emphasis added.)

Shortly thereafter, the court denied the defendant's motion to suppress on grounds not relevant to the present appeal. Defense counsel then raised additional issues with respect to Detective Sear's potential trial testimony. Specifically, defense counsel argued, inter alia, that any statements that Duke made to Detective Sear during the interview are testimonial hearsay and not admissible at trial pursuant to *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The following colloquy ensued:

"The Court: All right. Does the state intend to offer the substance of that interview and the statements that [Duke] made?

"[The Prosecutor]: I think that the jury should know that Detective [Sear] met with [Duke] for sure.

"The Court: All right. And—but are you offering [Duke's] statements to the detective at trial?

"[The Prosecutor]: The state is not offering that as evidence, Your Honor.

"The Court: There's your answer. There's no *Crawford* issue."

On February 13, 2018, the first day of trial, but before

the jury was sworn in, defense counsel again raised to the court the issue of Detective Sear testifying on the topic of his interview with Duke:

"[Defense Counsel]: And then also, Your Honor, on—on Thursday last week we had talked about—a little bit about the hospital visit of Detective Sear. And our position, the court may recall, was that given the fact that no statement from [Duke] would be admissible because it's testimonial hearsay, that there's just no relevance to that meeting between Detective Sear and—

"The Court: No, I disagree. Do you intend to offer any statements from that meeting, or just the fact that it occurred?

"[The Prosecutor]: Do I intend to offer any statements from that meeting? I'm going to ask Detective Sear, did there come a time that he met with [Duke]. And I don't know exactly what his response will be, but I'm not going to [ask] what did he tell you.

"The Court: All right. I think that answers your question. The fact that he met with [Duke] I think is highly relevant. It shows the integrity and the thoroughness of the investigation, which is always an issue in a criminal trial.

"[Defense Counsel]: But—

"The Court: And it sounds like the state does not intend to offer any statements from [Duke], which would qualify as hearsay evidence.

"[Defense Counsel]: But it presumes the competency of [Duke] regarding whatever was said.

"The Court: Well, you're free to cross-examine on that. Do you intend to cross-examine on that?

"[Defense Counsel]: I guess we'll see.

"The Court: All right. Well then it shouldn't be an issue. I mean, it seems to me that you're—that you're—you're jumping ahead. Just because he had a conversation with the person that somehow that calls the person's competence into—into question. If the state's not offering any substantive statements from [Duke] from that meeting, then I don't see what the hearsay problem is."

Detective Sear was the first witness to testify, and when he took the stand, he testified as follows with respect to his interview with Duke:

"Q. Did you ever meet with [Duke]?

"A. I did. I did meet with [Duke] I wanted to have him relay facts to me, even though his son was represented by power of attorney. I made arrangements to meet with him and develop what he could provide me with the information as to his concerns and validate the complaint.

"Q. Did he consent to the investigation?

"A. He did."

Defense counsel did not object at the time to Detective Sear's testimony. After the court dismissed the jury for its morning recess, however, defense counsel moved for a mistrial on the ground that Detective Sear's testimony that Duke had consented to the investigation was a constitutional violation under *Crawford* v. *Washington*, supra, 541 U.S. 36. Defense counsel further explained that he did not object at the time that Detective Sear made the comment because it "would have highlighted the damaging nature of that testimony to the jury," and that "[t]he only remedy is a mistrial" because if the jury was told to disregard that portion of Detective Sear's testimony, it only would have highlighted that remark for the jury.

The court disagreed with defense counsel on the basis that Duke's consent to the investigation is not a statement of fact offered for the truth of the matter asserted, but instead was a verbal act. As such, it concluded that Detective Sear's response was not hearsay, and, even if it was, the court explained that it was admissible under the residual exception to the hearsay rule because the circumstances under which Duke gave consent "bore a high level of credibility and authenticity," and it was almost akin to a dying declaration.[7]

The topic of Detective Sear's interview with Duke did not come up again until the rebuttal portion of the prosecutor's closing argument, during which she argued, inter alia: "Is it far-fetched to think that [Duke] would be generous with writing checks and then think who cares about the credit card? I would submit to you that [Duke] was generous in writing checks. *Why else would it explain that* [*Duke*], *gave consent to Detective* [*Sear*] *and to Ben Duke to pursue the charges that we have before you today.* Generosity is not on trial here. The only thing that's on trial is whether [the defendant] abused her authority to use [Duke's] credit card." (Emphasis added.) The defendant did not object during the prosecutor's rebuttal argument.

During its multiday deliberation, the jury submitted several notes. In one of the final notes that the jury submitted before reaching a verdict, it requested a replay of Detective Sear's testimony. After the court played Detective Sear's testimony, it played a one minute long portion of the defendant's testimony, which the jury had also requested. Then, after an additional five minutes of deliberation, the jury returned a verdict of guilty. The defendant later was sentenced to ten years of imprisonment, execution suspended after twelve months, followed by five years of probation. The court also ordered restitution in the amount of $12,908. This appeal followed. Additional facts will be set forth as necessary.

The defendant first claims that she was deprived of her constitutional right to confrontation under the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution when the trial court improperly admitted Detective Sear's testimony that Duke had consented to the larceny investigation.[8] Specifically, the defendant argues that Duke's consent constituted implied hearsay that was testimonial in nature, because it implied the content of Duke's statements to Detective Sear during the interview and the testimony was offered for the truth of the matter asserted, namely, that Duke consented to the investigation because he agreed that the defendant had made unauthorized purchases on his credit card. As such, the court's admission of the contested testimony violated the defendant's right to confrontation, because Duke was an unavailable witness and the defendant did not have an opportunity to cross-examine him. The defendant further argues that the state cannot demonstrate that the improper admission of Detective Sear's testimony was harmless beyond a reasonable doubt.

The state responds that Duke's consent to the investigation constituted a verbal act and, accordingly, was properly admitted into evidence as a nonhearsay statement. In addition, the state argues that even if Duke's consent constituted testimonial hearsay, the defendant is not entitled to reversal because such error was harmless beyond a reasonable doubt. We conclude that the trial court's admission of Detective Sear's testimony without limitation violated the defendant's right to confrontation and the state has failed to demonstrate that the error was harmless beyond a reasonable doubt.

We begin by setting forth the appropriate standard of review and governing legal principles. "The standard under which we review evidentiary claims depends on the specific nature of the claim presented. . . . To the extent a trial court's admission of evidence is based on an interpretation of [law], our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . .

"As a general matter, hearsay statements may not be admitted into evidence unless they fall within a recognized exception to the hearsay rule. . . . In the context of a criminal trial, however, the admission of a hearsay statement against a defendant is further limited by the confrontation clause of the sixth amendment. Under *Crawford* v. *Washington*, supra, 541 U.S. 59, hearsay statements of an unavailable witness that are testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously

has had the opportunity to cross-examine the unavailable witness. Nontestimonial statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence. . . . Thus, the threshold inquiries that determine the nature of the claim are whether the statement was hearsay, and if so, whether the statement was testimonial in nature, questions of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 617–19, 960 A.2d 993 (2008).

We first consider, as an initial threshold inquiry, whether Duke's consent to the larceny investigation constituted hearsay. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . The hearsay rule forbids evidence of out-of-court assertions to prove the facts asserted in them. If the statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay." (Citations omitted; internal quotation marks omitted.) *Farrell* v. *Johnson & Johnson*, 335 Conn. 398, 407, 238 A.3d 698 (2020); see also Conn. Code Evid. §§ 8-1 and 8-2. "Subject to certain exceptions, hearsay is inadmissible. . . . A statement is defined as an oral or written assertion or . . . nonverbal conduct of a person, if it is intended by the person as an assertion." (Citation omitted; internal quotation marks omitted.) *Loiselle* v. *Browning & Browning Real Estate, LLC*, 147 Conn. App. 246, 257, 83 A.3d 608 (2013); see also Conn. Code Evid. §§ 8-1 and 8-2. "If the conduct is assertive in nature, that is, meant to be a communication—like the nodding or shaking of the head in answer to a question—it is treated as a statement, and the hearsay rule applies." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 670, 735 A.2d 267 (1999).

"There are certain circumstances when, although the witness did not repeat the statements of another person, his or her testimony presented to the jury, by implication, the substance of another person's statements. . . . Under these circumstances, a witness has implied an out-of-court statement of another by testifying to the witness' own verbal or nonverbal response to an identifiable conversation." (Citation omitted; internal quotation marks omitted.) *Loiselle* v. *Browning & Browning Real Estate, LLC*, supra, 147 Conn. App. 257–58; see *State* v. *Burton*, 191 Conn. App. 808, 832–33, 216 A.3d 734 (concluding that unmarked photographic array documents offered for purpose of establishing inference that eyewitnesses were unable to identify defendant constituted implied hearsay), cert. denied, 333 Conn. 927, 217 A.3d 995 (2019).

We now turn to a category of nonhearsay statements known as verbal acts. "A verbal act is an out-of-court statement that causes certain legal consequences, or, stated differently, it is an utterance to which the law

attaches duties and liabilities . . . [and] is admissible nonhearsay because it is not being offered for the truth of the facts contained therein." (Internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 255, 856 A.2d 917 (2004). Often cited examples of verbal acts include words of offer and acceptance in a contract action; *Gyro Brass Mfg. Corp.* v. *United Automobile Workers, Aircraft & Agricultural Implement Workers of America, AFL-CIO*, 147 Conn. 76, 80, 157 A.2d 241 (1959); *Carrano* v. *Hutt*, 93 Conn. 106, 111, 105 A. 323 (1918); defamatory statements in a slander action; *Hayward* v. *Maroney*, 86 Conn. 261, 262, 85 A. 379 (1912); an offer of a bribe; *State* v. *Halili*, 175 Conn. App. 838, 861, 168 A.3d 565, cert. denied, 327 Conn. 961, 172 A.3d 1261 (2017); and statements of conspirators that form the basis of the conspiracy. *State* v. *Azevedo*, 178 Conn. App. 671, 680–81, 176 A.3d 1196 (2017), cert. denied, 328 Conn. 908, 178 A.3d 390 (2018).

In the present case, Duke's consent to the larceny investigation was an out-of-court statement. See *State* v. *King*, supra, 249 Conn. 670 (conduct that is meant to be communication is treated as statement for hearsay purposes). Moreover, although Detective Sear did not repeat any of the specific words that Duke spoke, Detective Sear's testimony presented to the jury, by implication, the substance of Duke's statements during the interview. Specifically, Detective Sear's testimony implied that, after being informed of the nature of the investigation into the defendant's conduct with respect to the credit card transactions at issue, Duke communicated to Detective Sear that the police had his permission to continue to pursue the larceny investigation because the transactions were unauthorized, which is precisely what the prosecutor argued in her closing rebuttal argument. The full context of Detective Sear's testimony to the jury further highlights this implication. That is, immediately before the question and answer related to Duke's consent, Detective Sear stated that he met with Duke to "have him *relay facts* to me . . . and develop what he could provide me with the information as to his concerns and *validate the complaint*." (Emphasis added.)

Next, we consider the purpose for which Duke's out-of-court statement of consent was admitted. We conclude for three reasons that it was admitted for the truth of the matter asserted, and, thus, constituted hearsay. First, the court stated, when ruling on the defendant's motion for a mistrial, that Duke's consent was not hearsay because it was a verbal act, but, even if it were hearsay, it would be admissible under recognized exceptions to the hearsay rule. Specifically, the court said that it would admit the statement under the residual exception, and that the statement was akin to a dying declaration. Irrespective of whether these hearsay exceptions were, in fact, applicable, it is significant that the court indicated to the parties that it would admit

the statement even if it were hearsay.

Second, the court admitted the statement at issue without limitation. "Evidence that is admissible . . . for one purpose but not for another, is admissible . . . for that purpose. The court may, and upon request shall, restrict the evidence to its proper scope." Conn. Code Evid. § 1-4. "Absent a party's request for a limiting instruction, upon the admission of evidence, the court is encouraged to instruct the jury on the proper scope of the evidence or inquire whether counsel desires a limiting instruction to be given." Conn. Code Evid. § 1-4, commentary; see also *Rokus* v. *Bridgeport*, 191 Conn. 62, 67, 463 A.2d 252 (1983) ("it is the better practice for the trial court to instruct the jury whenever evidence is admitted for a limited purpose even when not requested to do so"). If Duke's consent had been admitted only as a verbal act, the jury should have been so instructed.[9] Because the court did not place any restriction on the jury's use of the testimony, the evidence could be used for any purpose. See *Curran* v. *Kroll*, 303 Conn. 845, 864, 37 A.3d 700 (2012) ("This evidence was admitted in full, without limitation. In the absence of any limiting instruction, the jury was entitled to draw any inferences from the evidence that it reasonably would support."). In the present case, the failure to limit the purpose for which Duke's statement of consent came in was particularly egregious because, as we explain subsequently, it resulted in a violation of the defendant's constitutional right to confrontation. See *State* v. *Atkins*, 118 Conn. App. 520, 535–36, 984 A.2d 1088 (2009) (concluding, in context of reviewing for plain error trial court's failure to give limiting instruction concerning use of evidence of prior misconduct, that "[t]he failure by the court to give, sua sponte, an instruction that the defendant did not request, *that is not of constitutional dimension* . . . is not so egregious that it affects fundamental fairness or the integrity of and public confidence in the judicial proceedings" (emphasis added)), cert. denied, 295 Conn. 906, 989 A.2d 119 (2010).

Third, the prosecutor's closing rebuttal argument that the jury should infer that the defendant made unauthorized purchases with Duke's credit card because otherwise Duke would not have consented to the police pursuing charges against the defendant, is a powerful indicia that the parties and the court understood that Duke's statement of consent was admitted for substantive purposes. That is to say that if Duke's statement of consent was admitted solely as a verbal act, it would have been improper for the prosecutor to argue that Duke's statement should be understood to mean that he had not authorized the credit card transactions, particularly in light of the fact that Detective Sear had testified, outside of the presence of the jury, that Duke "was insistent that he never authorized [gift card transactions] and he never authorized any purchases within

the T.J. Maxx store . . . ." See *State* v. *Alexander*, 254
Conn. 290, 306, 755 A.2d 868 (2000) ("A prosecutor, in
fulfilling his duties, must confine himself to the evi-
dence in the record. . . . Statements as to facts that
have not been proven amount to unsworn testimony,
which is not the subject of proper closing argument."
(Citations omitted; internal quotation marks omitted.)).
For Duke's statement of consent to be admitted prop-
erly as a verbal act, the consent would have to be offered
for a purpose related not to its substance but, rather,
solely to the fact that it was given.[10] See *State* v. *Perkins*,
supra, 271 Conn. 255. By simultaneously arguing that
Duke's consent was admitted as a verbal act and that
the prosecutor's substantive use of the consent in her
closing rebuttal argument did not constitute prosecu-
torial impropriety, the state attempts to have it both
ways. It cannot. The statement of consent was either
a verbal act and it was prosecutorial impropriety to
use it for substantive purposes in the closing rebuttal
argument, or, the statement of consent came in as
implied hearsay under an exception to the hearsay rule
and it was not improper for the prosecutor to use it
substantively in the closing rebuttal argument. We reach
the latter conclusion, and express no opinion as to
whether, under a different set of circumstances, an out-
of-court statement of consent could constitute a ver-
bal act.

The second inquiry under our confrontation jurispru-
dence is to determine whether the statement at issue
is testimonial in nature. See *State* v. *Smith*, supra, 289
Conn. 622 ("the confrontation clause applies only to
statements that are testimonial in nature"). During oral
argument before this court, the state conceded that if
we were to conclude that Duke's statement of consent
came in for substantive purposes, it was testimonial in
nature. See *State* v. *Sinclair*, 332 Conn. 204, 219–20,
210 A.3d 509 (2019) ("Statements are nontestimonial
when made in the course of police interrogation under
circumstances objectively indicating that the primary
purpose of the interrogation is to enable police assis-
tance to meet an ongoing emergency. *They are testimo-
nial when the circumstances objectively indicate* that
there is no such ongoing emergency, and *that the pri-
mary purpose of the interrogation is to establish or
prove past events potentially relevant to later criminal
prosecution.*" (Emphasis in original; internal quotation
marks omitted.)). Because we have determined that
Duke's statement of consent came in for its truth and
the state has conceded that under such circumstances
the statement was testimonial, and because the state-
ment was provided amidst an interrogation to establish
or prove past events potentially relevant to later crimi-
nal prosecution, we conclude that the statement was
testimonial in nature.

As previously mentioned, pursuant to *Crawford*,
"hearsay statements of an unavailable witness that are

testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness." (Internal quotation marks omitted.) Id., 218. In the present case, it is undisputed that Duke was unavailable because he had died; *State* v. *Frye*, 182 Conn. 476, 481, 438 A.2d 735 (1980); the defendant did not previously have the opportunity to cross-examine him, and Duke's consent to the larceny investigation was testimonial in nature. Therefore, the court violated the defendant's right to confrontation under the federal constitution by admitting, without limitation, Detective Sear's testimony that Duke consented to the larceny investigation.

This conclusion, however, does not end our inquiry. We must also consider whether the defendant was harmed by this error. "Because the error is constitutional in magnitude, the state has the burden of proving [that] the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Hutton*, 188 Conn. App. 481, 521, 205 A.3d 637 (2019). "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 289 Conn. 628.

First, we conclude that this is a close case because there was a dearth of evidence on the critical factual question of whether Duke authorized the defendant to use his credit card to purchase items for her personal use, or whether the defendant wrongfully appropriated Duke's money for such purchases. In other words, the key question to be answered by the jury was whether the items that the defendant purchased with Duke's credit cards were gifts, or whether they were stolen. Additionally, it is important to note that the jury was presented with evidence that Duke often had gifted the defendant money, and the state did not charge the defendant for theft of those funds. Moreover, there are only two people who could have definitively answered the critical question: the defendant and Duke. By virtue of the admission of Detective Sear's testimony that Duke consented to the larceny investigation, Duke effectively testified against the defendant on this critical issue, from the grave, without ever having been subjected to cross-examination. See *State* v. *Hutton*, supra, 188 Conn. App. 503–504 ("[t]he test of cross-examina-

tion is the highest and most indispensable test known to the law for the discovery of truth" (internal quotation marks omitted)). Indeed, the defendant never had an opportunity to ask Duke under oath whether he had consented to the investigation because he did not authorize the credit card transactions or, conversely, whether he had let the defendant use the credit card for personal reasons and that he had consented to the investigation in the belief that she would be exonerated. Finally, we note that less than ten minutes after the jury reheard Detective Sear's testimony it returned a guilty verdict. These circumstances suggest that the admission of Detective Sear's testimony influenced the judgment of the jury.

The state argues that the court's error in admitting Detective Sear's testimony was harmless beyond a reasonable doubt because (1) Ben Duke also testified that Duke had given him permission to go to the police regarding the credit card transactions at issue,[11] and (2) in light of the other evidence at trial, the jury reasonably could have concluded that the defendant's use of Duke's credit card was unauthorized.

We are not persuaded. With respect to the state's first argument, we acknowledge that Duke's improperly admitted statement could be considered cumulative of Ben Duke's testimony, and, as such, that factor favors the state's position that the admission of Duke's consent was harmless. As the defendant points out, however, Ben Duke is an individual with both a financial and emotional interest in the outcome of the case, and, therefore, his testimony on this issue likely would have carried less weight with the jury than the hearsay statement of the witness, Duke, who had a critical perspective in the matter.

As to the state's second argument, it fails to appreciate the magnitude of the state's burden. It is not sufficient to say that the jury could have reached the same result in the absence of the improperly admitted testimony. The state must establish, beyond a reasonable doubt, that the improperly admitted testimony did not have a tendency to influence the judgment of the jury. In this vein, with respect to the overall strength of the prosecution's case, we consider the following to be significant: (1) there were a number of letters submitted into evidence, written by Duke, that corroborated the defendant's story that the two were having a romantic relationship and that he enjoyed providing for her financially; (2) the evidence suggests that Duke was aware of the defendant's spending on his credit card, as he was the one that wrote the checks to pay for the charges; and (3) aside from Ben Duke and Detective Sear's testimony that Duke authorized and/or consented to the larceny investigation, there was no other evidence regarding Duke's mindset after the defendant's employment was terminated.

Under these circumstances, we conclude that Detective Sear's testimony that Duke consented to the larceny investigation may have had a tendency to influence the jury's decision to find the defendant guilty of larceny of an elderly person by embezzlement in the second degree in violation of §§ 53a-119 (1) and 53a-123 (a) (5). As such, the state has failed to meet its burden of proving, beyond a reasonable doubt, that the improper admission of Detective Sear's testimony and its effect on the jury was harmless.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI. "[T]he sixth amendment rights to confrontation and to compulsory process are made applicable to state prosecutions through the due process clause of the fourteenth amendment." (Internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 593, 175 A.3d 514 (2018).

[2] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[3] We refer to Robert Duke, Sr., and Jeanette Duke collectively as the Dukes.

[4] The defendant testified that Duke came up with two different "plans" concerning the money that he was giving to her. The first plan was to say that Duke was giving money to the defendant as a loan that she would repay when she sold a property that she owned in Jamaica. The second plan, which took effect after the defendant returned to work in approximately April, 2012, was to say that the defendant had breast cancer and the money from Duke was to pay for medical expenses. The defendant further testified that she used the money for her business and to take care of herself and her family.

[5] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: (1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody. . . ."

[6] General Statutes § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (5) the property, regardless of its nature or value, is obtained by embezzlement, false pretenses or false promise and the victim of such larceny is sixty years of age or older, or is a conserved person . . . or is blind or physically disabled . . . ."

[7] Specifically, the court stated, inter alia: "It's an act. I agree, is an act. It's not—it's not a statement of fact. So it's not even hearsay. . . . [Y]our exception is noted for the record. I would note that even if—under the totality of the circumstances offered at the hearing and during today's testimony, that even if it were hearsay, I would still admit it under the residual hearsay evidence rule in as much as it's apparent under the totality of the circumstances, that the statements were—that the circumstances under which the statement was made bore a high level of credibility and authenticity.

"It was taken at a time when [Duke] obviously was very concerned about his finances and had every reason to be fully transparent with the investigation about the nature of his finances.

"It's almost, it's not exactly, but it's almost like a dying declaration. Somebody in that situation, I think would be very, very interested in getting his finances in order. So it bears independent indicia of reliability.

"And therefore, even if it were hearsay it would—it would be admissible. And it was not, in my view, testimonial nature.

"And again, at the very heart of it, it's not a statement, it's an act."

[8] The state concedes that the defendant's claim under the federal constitution is preserved. It maintains, however, that the defendant's claim under the state constitution is not preserved. Because we conclude that the defendant's

right to confrontation under the federal constitution was violated, it is unnecessary to consider whether the state constitution provides greater constitutional protections with respect to the right to confrontation.

[9] The fact that the defendant did not ask for a limiting instruction, with respect to the admission of Duke's consent solely as a verbal act, is not fatal to her claim because such a request likely would have been futile in light of the fact that the court said it would admit the statement even if it were hearsay.

[10] We note that, here, Duke's statement of consent does not appear to have had any legal consequence, as the police generally do not require consent from the victim of an alleged crime in order to conduct an investigation. See *State* v. *Perkins*, supra, 271 Conn. 255 ("verbal act is an out-of-court statement that causes certain legal consequences" (internal quotation marks omitted)). Moreover, to the extent that Detective Sear testified that the police require a sworn statement to make a complaint official, Ben Duke provided such a sworn statement before Detective Sear interviewed Duke.

[11] Specifically, Ben Duke testified: "My father said I could go to the police. . . . And so I had his authorization [to] do that." The defendant has not challenged the admission of this testimony.

———————————————————